on today's calendar. The case is Donald Parkell v. Carl Danberg et al. Okay. We've got a bevy of counsel here. I want to have their say. I want to have their say. We're going to comply with the time requirements here, unless we don't comply with the time requirements. We'll comply, Your Honor. Okay. First, we'll call Mr. Walsh. Good morning. Brennan Walsh on behalf of Plaintiff Appellant Donald Parkell. First, I want to thank the Court for allowing us to split the argument in time. I will be presenting the arguments on the strip search, ruteness, and supervisory liability issues. My colleague, Ms. Bradley, will be presenting argument on Mr. Parkell's Eighth Amendment claims and appointment of counsel. I would like to reserve two of my eight minutes for rebuttal, please. Okay. May it please the Court. That request will be granted for two minutes. Thank you, Your Honor. Thank you, Mr. Walsh. I want to start this morning with Mr. Parkell's argument challenging the constitutionality of the strip search policy at James T. Vaughan Correctional Center. Can I ask you a question? It's kind of a threshold thing. I noticed that you wrote the Fourth Amendment. Was that argued before the District Court? It was, Your Honor. It was not discussed in the District Court's opinion, but in our brief, in the issues presented, I think, where we were required to show where the issues were preserved, it was not only in his complaint, but it was also littered. And your friend didn't squawk about it either, so. No, it was all over the brief, Your Honor. But you cited the strip search question in isolation as part of your, as one of your arguments in the Eighth Amendment claim, too, didn't you? Well, it goes to kind of the conditions of confinement. We presented it more as a Fourth Amendment issue. Yeah, I mean, the District Court didn't decide it. The argument could be made they didn't decide it because you didn't properly tee it up. We think it was properly teed up. I mean, especially Mr. Parkell was pro se below. He cited actually a fair amount of law on this Fourth Amendment issue, so we think it was preserved. Okay, tell us, tell us why. Yeah, there's no slides of violation. During the 12 days he was in isolation, he was strip searched every eight hours. Every time the shift turned over, regardless of whether he left the cell, and he usually didn't, he was only allowed out every other day for one hour, he was subjected to a very invasive and humiliating strip search. The case that's on point here is I think the Supreme Court's decision in Bellevue-Wolfish, and the Court said there that courts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted. I think when the Court looks at all of those factors, there's at least a genuine issue of material fact as to whether this policy was constitutional. Is there any evidence at all of personal involvement by any of these defendants? Your Honor, there is, and we cited in our reply brief, so the issue of personal involvement, basically what the District Court said is, well, none of these, there's no evidence that any of these particular defendants were involved in the actual strip search, but the test is a little more nuanced than that. It deals, and so to be clear, we're not arguing respondeat superior liability, that's not allowed under the case law. Correct. But what the case law does say is that personal involvement can be demonstrated with knowledge and acquiescence in the constitutional violations of a subordinate. But is just pure awareness going to be enough? Because it could be said that that's all that's shown, that they may have known about it, but that was it. Well, we think that should be enough here. I mean, especially with, for example, Captain Rush Bowles, he was the unit commander of the SHU, and he said he was responsible for basically everything that happened in the issue. Is there any evidence that your building or isolation, there's no evidence that this is probable or likely, is there? He actually has returned there since, and he, so this, and what the court said, and I think it was the Torres v. Fowler case that was cited in our brief, there's a reasonable expectation that at various points throughout an inmate's incarceration, they will end up in administrative segregation. Well, this particular inmate, what evidence is there that there's an expectation that he'll wind up in solitary again? Well, first of all, he has. He was there as most recently as this past June. He was there in, I think, in the isolation unit, and he was subjected to the same exact procedure. He's got a number of lawsuits against the corrections officers, and when you talk to him, he keeps talking about how he's been... Is that in, or that wasn't in the record in the district court? In fact, the district court didn't even realize he was back in the institution. Yeah, he didn't, and then this happened in his most recent state is in June of this past year. Yeah. He actually, he filed another lawsuit about that, actually a punitive class action about that particular state. But my point is, that's not in the record, is it? It's not in the record, Your Honor. So, I mean, we can't decide that question. Well, I think the court could take judicial notice of the fact that he has challenged this in another litigation. But we would have to speculate as to whether somebody like Mr. Porkel is likely to be put back in isolation. I don't think it's too speculative. I mean, we know that he has gone back there. Well, at best, we'd have to see whether, likely, the repetition and in-date review you're talking about. That's correct, Your Honor. Yeah. I think especially here, he was only there for 12 days. I'm curious about your Fourth Amendment claim. The court, you say it was in front of them, but the court really didn't consider it. The court basically just said it was justified for security reasons, correct? The court what? Said it was justified for security reasons. Okay, yeah. And we don't know what those security reasons were. The record doesn't show what those security reasons were. That's correct. I mean, can we decide this, or do we have to send this back to the district court? Well, I think there is nothing in the record about what these security reasons are. They've cited some new documents on appeal for the first time. I mean, I think as far as I'm concerned, I don't see how this policy could be constitutional, given that it's a blanket policy and has nothing to do with whether there's any possibility of obtaining contraband. Well, there's the affidavit by Captain or Major Respoli, or whatever his name is, saying that as a matter of procedure, every time there's a change of guard, whatever it is, eight hours, that there's a prescription. Right. And so there's no question that this practice exists. And there's no question it was before the district court that this question was before the district court. It certainly was. That affidavit was filed with the district court. It was, but he didn't get it. It was very vague security reasons. Well, I'm trying to find out. Your position then is that we should remand this back to the district court to ferret out if there is or is not a requirement as a matter of procedure that someone be strip searched without having any contact, which would bring in the requirement for a strip search, correct? So there's no question that is the policy, that regardless of whether there's an opportunity to obtain contraband, there's strip searches every eight hours. The question that would go back to the district court would be whether it's justifiable. I think, based upon the record, there's no justification that I've seen. I think this is a plainly unconstitutional policy. Well, during this period of time, they see other personnel in the prison. They see people feeding them. They see medical people treating them. This inmate in particular had substantial treatment from various factors. Your basic position is, though, as I understand the brief, is that it's a violation of his 1983 violation of his constitutional rights to be strip searched without having had any contact with anyone on the outside that could have given him any contraband. That's correct, and when we look at the cases that we said in our brief, the Franklin case from, I believe, the 8th Circuit, the Hodges case from the 2nd Circuit, what those cases discuss is whether there's no contact with any non-prison personnel. Well, why can't we decide that as a matter of law on appeal, that at prison, if they acknowledge there is a procedure and that the captain of Estolian says there is that procedure, whether or not something like that would be a violation of the Fourth Amendment or the Eighth Amendment? I'm not too sure where we are. To put it this way, I think that there's insufficient evidence to justify the policy here. On appeal, the only evidence is that they say it's required for security reasons. I don't think that on this record the court could uphold the constitutionality of policy. I think as a matter of law, a court could say that there's no justification that would allow prisoners to be strip searched. All right, that's your position. All right, we'll have you back on rebuttal. Thank you. We'll hear from Ms. Bradley on the Eighth Amendment and appointment of counsel questions. Ms. Bradley has seven minutes, unless you want one minute for rebuttal. Yes, I want one minute for rebuttal. Thank you. Suzanne Bradley on behalf of Appellant Donald Parkell. Again, I'd like to thank the court for allowing me to split time with Mr. Walsh. Absolutely. As Mr. Walsh noted, I will address Mr. Parkell's claims regarding defendant's violation of his Eighth Amendment rights, as well as the need for appointment of counsel in this matter. Because genuine issues of material fact exist regarding defendant's deliberate indifference to Mr. Parkell's serious medical needs, and because the district court abused its discretion in failing to appoint counsel, this court should reverse the district court's grant of summary judgment and remain with instructions to appoint counsel for Mr. Parkell. With respect to the Eighth Amendment medical needs claims, Mr. Parkell must show a serious medical need and defendant's deliberate indifference to that need. Here, the district court held, and defendants not disputed, that Mr. Parkell demonstrated a serious medical need. Therefore, the only question is whether defendants had deliberate indifference to the need. Because genuine issues of material fact exist with respect to deliberate indifference, summary judgment was improper. If we could start with Nurse Bryant. She did order x-rays for your client with normal results, and really he got worse after she saw him. How is she hooked into this? She's involved, Your Honor, because the fact that she provided care to Mr. Parkell doesn't automatically negate a deliberate indifference claim against her. She made statements to Mr. Parkell, which he has submitted through his pleadings, that could demonstrate that she was meeting his complaints with derision and ridicule and other cases of health, but that can be sufficient to demonstrate deliberate indifference on her part. So the fact that she gave care ultimately would not negate that. I want to hone in on another question. It's a physical therapy question. Yes, Your Honor. The private medical providers, Correctional Medical Services and Correct Care Service, both argue that the reason that that therapy wasn't given quicker and more extensively was departmental policy. If that's the case, how can you hold these two private contractors responsible? Well, Your Honor, the fact that both CMS and CCS defer to this institutional policy as the reason why Mr. Parkell didn't get therapy is insufficient here, because that demonstrates, as this Court held in Dermer v. O'Carroll, a non-medical reason for an extensive delay in treatment, and that can render summary judgment improper, as it did in this case. What makes the Nathan Bennett case not a negligence case? He had surgery, he had interplay with therapists, he had drugs that were administered to him. The level of care he got was extensive and, true, he had some problems, but how does this trip into an Eighth Amendment case and not a negligence case? Well, Your Honor, again, the fact that he received care doesn't negate these claims. He doesn't disagree with the fact that he did receive care. His disagreement is not with the form or the type of treatment, but rather that there were extensive delays in his having to receive this treatment. He submitted numerous grievances in order to obtain the surgery, to obtain physical therapy, to obtain medication. But what in the record indicates that they delayed it or kept it from him to punish him or to penalize him in some way? What indicates that this was nothing more than they didn't get around to him perhaps as quickly as they should have? Well, Your Honor, I think that in this case the delay is so extreme that it would be unreasonable to say that it was just they didn't get around to him. He received physical therapy three times over a seven-month stretch. And I think in this case the fact that he didn't receive prescribed treatment and had to frequently request grievances, frequently submit grievances in order to even be noticed, brings this into the Eighth Amendment realm. With respect to the non-medical conditions of confinement, which is the second sort of prong of his Eighth Amendment claims, first the medical needs, now the non-medical conditions of confinement, there's denial of basic sanitation and meaningful recreation in both the infirmary and isolation that both this Court and other circuits have held can constitute an Eighth Amendment violation. And the District Court improperly relied on defendants' affidavits, including Captain Raspoli's affidavit and Deputy Warden Pierce's affidavit, saying that inmates receive hygiene items when requested or that there's no policy to deny medical treatment or no policy to deny recreational opportunities. For example, the District Court agreed with defendants that there's no policy prohibiting inmates from recreation while they're in the infirmary. However, it's acknowledged by Deputy Warden Pierce that inmates of different security classifications can't commingle. Therefore, an inmate with a higher security classification in the infirmary by default does not receive recreation. So although there's no written policy, the custom and practice is that that doesn't happen. Your physical therapy claim is perhaps a straw claim, no question about it. But you never even exhausted that administratively. He did, Your Honor. In what way? I thought that there was a bit exhausted of that. Well, first, Your Honor, the defendants only raised the failure-to-exhaust argument before this Court, and therefore it should have been waived. No, no, I'm saying administratively it has to be exhausted. But he did file a grievance. He filed two grievances that mentioned physical therapy, and the defendants' response to both grievances mentioned physical therapy. But you're saying even if he didn't, the argument's waived because it wasn't raised. Correct, Your Honor. Correct. If I may move to the appointment of counsel issue now. This Court has held the District Court has broad discretion to request an attorney to represent an indigent civil litigant. Here, the District Court clearly abused its discretion by failing to appoint counsel to Mr. Parker. Well, if we agree with you in any of these arguments, you're asking us the next time around to direct the District Court to appoint counsel. Correct, Your Honor, especially because, as Mr. Walsh noted, there is a need for more development of the record below relating to his issues, to physical therapy, to the justifications for the delay, and same for the conditions of confinement. So the appointment of counsel would be necessary. All right. I see my time is up. Ms. Bradley, thank you very much. Thank you. We'll have both of you back on rebuttal. And we'll call Ms. Scott. Thank you, Your Honor. I'm here today with my co-counsel, Joseph Hanlon, who represents the state appellees. The appellees have agreed to a division of time. I have seven minutes of the 15 minutes allotted. May it please the Court. Your Honors, I asked Mr. Walsh whether or not the issue of the Fourth Amendment was raised below in the District Court, and I submit that it was not. Mr. Parkell's claims below were Eighth Amendment claims that he was subjected to cruel and unusual punishment based on his confinement in the infirmary. Well, maybe it wasn't for Veltius. No one, including his own counsel, knew where he was. The Court was unaware that he had returned. So there couldn't be, there was a, the Court ruled that there was a mootness problem in the case when actually he had returned. Your Honor, with respect to the mootness argument, it's true that through this Well, I'm saying it's, the question of the Fourth Amendment strip search is still before us and could be remanded properly if we decide to, because it really was before the District Court, but the District Court ruled that there's nothing before it because it's moot. Well, I would state that Mr. Parkell did not make Fourth Amendment claims below. He made Eighth Amendment claims about the conditions of his confinement, and he made Fourteenth Amendment. Even though it's a Fourth or Eighth Amendment process, we could still, we have the ability to relate it to whatever constitutional revision is appropriate. That's not a valid And I agree that we did not argue that You haven't raised this waiver forfeiture, right? You haven't argued that there's a forfeiture of the Fourth Amendment claim, right? We did not, because the Court specifically requested we address whether or not The question is, I think, there are two questions here. The policy of the every eight-hour strip searches for isolation, and the question of whether or not there's enough in this record for us to decide that question. Would you direct your attention to both of those? Yes, Your Honor. With respect to the Fourth Amendment claim, regardless of whether Mr. Parkell raised it below, he, the Fourth Amendment, there is no, under the Eighth Amendment, there is no clearly established constitutional right to be free from strip searches while you're in prison. However, the Court has recognized a limited Fourth Amendment right, which is a, not a black and white test, but it's a test that, it's a balancing test. To acknowledge that the prison has a policy, which requires that on the change of the guard, or whatever it is, every eight hours, or whatever the time period be, that any inmate there within that facility that's in confinement is strip searched. Yes, Your Honor. There is a practice in the isolation unit. Why is that? What's the necessity for that policy that's appropriate to strip search which are a very, very, recognized as a very invasive Fourth Amendment requirement? Yes, Your Honor. And as the Court has recognized that institutions have a security interest in not only preventing inmates from obtaining contraband, which is anything that are not supposed to have. But if someone is locked in security, and doesn't see anyone for eight hours, and there's a change in the guard, is your position that the prison has a security problem requiring that man to be strip searched? Your Honor, it's our position that in this case, Mr. Parkell points to cases in other circuits that show that, you know, that there may be a Fourth Amendment violation when an inmate has no possible opportunity because they were under constant supervision. For example, in a case where an inmate was... Why doesn't that apply here? That doesn't apply here because Mr. Parkell was not under constant supervision. But he was in isolation. He was in isolation, but he was also seen on a daily basis by medical providers, by mental health providers. Every eight hours? Three times a day, every eight hours? Does the record reflect what you're saying, that during that eight-hour period, he had contact with someone? The record reflects that during those 24 hours, he had contact. Now, we've got to go in eight-hour periods here because every eight hours, there's an invasive search. And if you don't have a reason for it, that search would be a violation of 1983, a constitutional... He's entitled to be reimbursed for his violation of a constitutional right. Now, in your position, during every eight-hour period, he had contact with someone such that he could have been given concubine or a weapon or whatever? The record reflects that at least... I can't speak to every eight-hour shift. However, the inquiry isn't only whether he could have been provided. He was provided contraband by somebody outside of his cell. How could he be provided? He's in isolation. He is. It seems to me that you have the harder position here as representing the state defendants. At least they can say, well, it was a policy that the state implemented. But you're the state. You implement the security policies. You get somebody in isolation. There may be a random prison visitor from medical care. There's no record here that that existed. But you have this policy that no matter what, we're going to strip search him every eight hours. And, I mean, assuming this claim is properly before the court, and you haven't raised that it wasn't before the court, how can that be constitutional under case law? What is it that you can show that you have a legitimate peniological interest that you need to do that? Well, Your Honor, it's Mr. Parkell's burden to show that the policy could never be implemented in a manner that would be unconstitutional. That would be constitutional. That would be constitutional. And here there is evidence in the record that he had the opportunity. I don't know how somebody in isolation has an opportunity. Well, he has a bed. He has a sink. He has a toilet. We're talking about outside contact, or even with prison personnel, since there have been cases where contraband has been given, drugs even, weapons to prisoners in the prison. But in order to strip search someone, you've got to show during that eight-hour period that the inmate had some contact with someone. And the record, as far as I can see, and I tried to ferret it out, but it's a little difficult, as far as I can tell, does not support your position that during every eight-hour period at which he was strip searched, that the prior eight hours he had contact with someone, either from the outside or from prison personnel, such that he could have been the recipient of drugs or contraband. And if that's the case, it's a violation of his Fourth Amendment right. I'll let you down easy here a little bit. My second part of my question, which dovetails into what Judge Callan said, was is the record adequate for us to decide this question? Yes, Your Honor. It is? Yes. In your favor? Yes, Your Honor. Wow. So you want us to decide this? Yes, I do. How can we decide it in your favor? Tell us how. What will we hang our head on? Is it just that they got the wrong defendants? No, Your Honor. I mean, first of all, I mean, under the... Mr. Parkow did fail to make a Section 1983 claim, as we've said. He made a litany of complaints about the conditions of his confinement in the infirmary. We're talking about the Fourth Amendment question here. Right. Well, we're very liberal with procés, and you can't say that the Eighth Amendment or due process, that it wasn't in the mix. Maybe we're too liberal for procés. I should say that for a justifiable reason, but that's beside the issues in this case. Well, the court in Bellevue-Wolfish held that the institutions don't only have a security interest in preventing inmates from obtaining contraband, but from deterring inmates from obtaining contraband, whether it be outside the cell or inside the cell. And it is a fact-driven and case-specific analysis. And here there is evidence that Mr. Parkow had the opportunity. He had the opportunity because he was seen every day by someone, which he admits in his opening brief that he was seen by mental health providers, by medical providers, by the officers themselves. He was taken to the infirmary. But that these individuals are the most violent and most dangerous inmates in the prison who have violated the prison rules and gotten a sanction that is the most severe sanction you can receive, which is to be sent to isolation. I hear you. I don't even understand what Parkow... You're making an argument here that if this was a death row inmate in Delaware or if this was a violent criminal who was sentenced to 50 years in jail, but here's a guy that's been in and out. Yes. How dangerous is this guy? He got out and was back on the street. He's not the kind of dangerous person that you're describing. This isn't El Chapo who's going to escape through the toilet into a tunnel into Wilmington and get on a boat somewhere and go back to Mexico. This is just some guy that's in and out of the Delaware prison system. I disagree with that. Unfortunately, I would like to stick to the record, but Mr. Parkow, since you've asked, he was sent to isolation because he assaulted an officer. Take your position that he is a dangerous man. Yes. What right do you have to script search him every eight hours when he has contact with no one during that eight-hour period? No one, zero. Well, I disagree with the premise that he had contact with no one. However... No, no. You have to deal with that fact because the record does not reflect that every eight-hour period he had contact with either prison personnel, medical personnel, or someone from the outside. This may have to be remanded to make the record clear and certain, but that's the record that you have to deal with at this point on appeal. Now, if he's in there and during the eight-hour period he sees no one, he's locked up, he sees no one, what is your justification for script searching him on the changing of the guard every eight hours? I would go back to the factors that the court announced in Bellevue-Olefish, the scope, the manner, the justification, the place of the search, and that the security interests are not just to prevent the inmate from obtaining contraband but to deter the inmate from obtaining contraband. Well, part of your reason is you're saying that one of the reasons that you're trying to justify this is he was unsupervised. Now, I don't know how somebody in isolation who's unsupervised can obtain contraband. I haven't figured that one out yet. Well, Your Honor, again, I feel restricted to the record. However, there are things in the cell that an inmate... I've had many experiences with different inmate cases, and they have a bed, they have a sink, they have a toilet, and there are ways for inmates to obtain... So you're saying that somebody can create a shiv or create a dangerous instrument out of a piece of plumbing that may be in the back of a toilet. That's correct, or out of a spring in a mattress. Okay, that's not in the record. It is not in the record. There's no springs in these beds. I doubt that that's in the record. This goes back to my question. Is the record sufficient that we can decide this claim one way or another? And you said yes, and I think that's why some of us at the panel may have acted incredulously to your answer. Yes, Your Honor. Well, your basic position is that the prison can script search anyone any time they want for security purposes. That's your position. Is that correct? No, that's not my position. Tell us what your position is, Pearson. You worded why the words you want in our opinion, why this is an affirmance on this claim, that they didn't have a right to script search. What is the wording that we adopt? Your Honor, in this case, again, I go back to the case law that says that it's a balancing test, that the institution has legitimate security interests with maximum security inmates who are housed in isolation for violating the institution's rules. So the policy is we script search every eight hours anybody in this isolation area, right? That's correct. Okay. If we disagree with you and agree with your adversary that that does not pass constitutional muster as a policy, do you lose or do you have another way to get out of that? We disagree with the policy. We say that that does not pass constitutional muster. Well, Your Honor, as a threshold matter, Mr. Parkell's request for injunctive relief remained moot and that the district court's decision that his change in circumstances rendered that request moot. How about the damages claim? The moot in this court is that the court didn't know where he was. Even you didn't know where he was. Three weeks before, yes. You didn't even know where he was. The lawyer didn't know where he was. During that three-week window, no, I did not. Yeah, so you can't blame the court for making a wrong decision on mootness because it wasn't moot. And there is, according to what has been fleshed out, a claim here that this is capable of repetition and evading review. Your Honor, I disagree. When there has been a change in circumstance, and I agree, Mr. Parkell was returned to the James C. Vaughan Correctional Center three weeks before the district court rendered its decision on our summary judgment motions. However, there's no reasonable likelihood that he will be subjected to the same conditions he complained about at the beginning of this lawsuit, and those complaints were about the conditions of his confinement in the infirmary as a maximum security inmate. He's not claimed that he's returned to the infirmary as a maximum security inmate, and there's no reasonable likelihood that he will return to C building isolation. Okay. Ms. Scott, you're over your time, and we've dragged you over your time. Okay. But I think we want to hear from you. Okay. Thank you, Your Honor. Counsel. Okay. Mr. Toms? We'll go with Mr. Toms first. Your Honor, if we may, Mr. Toms and I are in similar positions. What would it be? Well, who's ever? Are you Mr. Griffith? Yes, Your Honor. Okay. May I proceed? You both can argue? We divided four minutes each. Well, proceed. I just have to—you're Mr. Griffith. You're here on correct care service. Yes, Your Honor. Okay, four minutes. Thank you, Your Honor. Give us your best. Don't get dragged into the prior argument. I will not, Your Honor. What I would like to do with my limited time is to compare the legal standard that applies to my client to the record. It's a deliberate indifference standard, which the courts have interpreted as subjective, subjective awareness that there would be a risk to Mr. Parkell if we essentially abdicated our role as the medical provider. It's an extraordinarily high standard, as Your Honor alluded to. It's almost a criminal state of mind. There must be some evidence in the record that we essentially abandoned our role of his medical provider. So against that standard, what we have in the record is my client, correct care solutions, referring him for outside consultations at our expense. Were you second or first, your client? We were second. And that's an important point, Your Honor, because we weren't even named until the complaint had been filed. The complaint was pending for two months. Well, you're here now, so you're before us now. I appreciate that, Your Honor. You're absolutely here. Can we cut to the medication issue? The physical therapy issue, I guess one of your friends could say, hey, it wasn't our, we couldn't help it. The medication issue seems to be something right within your bailiwick, right? Absolutely, Your Honor. So how is it that has that not pinned on your client? What the record shows on the medication issue, Your Honor, is that Mr. Parkell claims that the medication was supposed to be administered four times a day. We have an affidavit that was in the record before Judge Robinson, it was in the record before this panel that he had twice a day. And there's an affidavit in the record where I believe it's Ms. Damron or Nurse Bryant, actually took the time to call the outside orthopedist to confirm, hey, we see two times a day, Mr. Parkell is saying four times a day. And it's in the record in the affidavit where the orthopedic specialist confirmed, no, no, no, two times a day. So it's an example where Mr. Parkell's allegations, which I understand are sworn and therefore evidentiary, conflict with what's in the actual medical chart. So what we really have, and when I'm comparing the standard to a medical negligence standard or even just a mere negligence standard, a consultation we paid for, surgery we paid for, medication we paid for, time in the infirmary where he was seen every day, we have a period of time, a critical period of time between March and June of 2011, which is right after his surgery and right afterwards, where over the course of those three months he was seen by a medical provider 35 times. I understand. I would argue the same thing if I were you. But, I mean, he points out this medication issue. He points out it was not only he didn't get his medication, but others did as well. Now, in a summary judgment context, isn't that enough to bring it to trial? Not in a deliberate and different claim, Your Honor. What he needs to establish is not only that he did not get the medication, but not getting the medication represented such a departure from the standard of care that it was an abdication of our role, that there was some subjective mindset on the part of the actual medical provider, not a reasonable person standard, but some subjective belief on the part of the medical provider, a determination not to give him that medication, aware that it could do him harm. There's nothing in the record. Don't you save money if you don't give him medication? We don't. The way the medical contracts are divided, there's a mental health provider, we are the medical provider, there's a pharmacy provider. So we don't really save that much money by not ordering medication. Medication does run out sometimes, just like it does in the private sector, and it takes some time to refill that. So there might have been some gaps in time between his medication ran out and then we refilled it, and in Mr. Barkel's mind, that's a constitutional violation. From our perspective, at most, it's a delay that doesn't even rise to the level of medical negligence, let alone subjective actual knowledge or almost an intent to do Mr. Barkel harm by withholding from him his medication. None of that's in the record, Your Honor. Mr. Griffiths, we understand your position. Thank you, Your Honor. Mr. Toms? Good afternoon, Your Honor. Do you want to say ditto? I'm sorry, do you want to say ditto? Well, Your Honor, I think that our positions are only slightly different because they address different time periods. I wrote in Cori's name, formerly known as Correctional Medical Services, and there's Betty Bryant and Christina Dameron for the time period prior to June 30, 2010. And, Your Honor, I think what needs to be made clear related to that is that what I've heard, the testimony and what distinguishes the situation separate from the state is when it comes to the medical records, the record is robust. All of Mr. Barkel's records have been put into the record so that there is substantial evidence for the court to look through those and make a determination about whether or not there was sufficient evidence for the court to make that ruling. And what's been said, Your Honor, and set forth in the papers is that as to physical therapy, that Mr. Barkel claims that there was an extreme delay and that he only received three treatments of physical therapy in a seven-month period. But the standard, Your Honor, as what Mr. Griffith has said, is that there has to be an intentional denial. And if Your Honor is aware, the case of Brutus v. Plantier says that that is a prevention for recommended treatment, Your Honor. And the records in this case are sufficient enough for this court to rely upon, just as the court did below, that Mr. Barkel received what was recommended for him at that time. So, Your Honor, directing you to the record, on page 1,020 of the record, there's an August 2009 consultation referral for physical therapy. And what that says is it's a sending out for an initial consultation for physical therapy. There's nothing within that that says what the directed number of physical therapy appointments they should have because typically the outside vendor will set what that number should be. Following along in that record, Your Honor, several months later, at 1,019 within the record, this is now March of 2010 where one of the providers is recommending an MRI treatment. And they state in there that previous evaluations in three sessions of physical therapy are with zero effect. Recommend further investigation. And there's notes within that record where there's an alternative treatment discussed between the various providers and there's a recommendation that they consider additional treatments of physical therapy before moving to an MRI. So, Your Honor, the record clearly establishes what the doctors were thinking about, how they were looking at Mr. Barkel, what treatment he should receive. And there's nothing in the record that says he didn't get what was recommended to him by any of the treating physicians or any of the outside services. How about Nurse Bryant? Well, so Nurse Bryant, Your Honor, what they want to do is characterize her treatment as derivative and decisive. But what the court focused on below and what this court should consider as well is looking at the record. If you look at the sick call slip that Mr. Barkel submitted, and that's found at 402 and 403, Mr. Barkel's complaint at the time was for pain medication, nothing related to his elbow. However, after he has seen, Nurse Bryant addresses him, considers what's appropriate, orders an X-ray, which she felt to be appropriate related to his complaint. And there's an affidavit that she submitted and says that she looked at his elbow and didn't see a problem. And only after the fact, when he actually does have an infection in his elbow, does he point backwards and say that was a problem. There's nothing in the record prior to the elbow problem to suggest that that was an issue. And so, Your Honor, what about the cases that your adversary pointed out on being dismissive? I mean, she said, you know, I'm not going to fall for it, get him out of here, he's not allowed to talk. I mean, doesn't that kind of conduct fit into the cases that were cited? Well, they're different from the cases that we have here, Your Honor. In those cases, or this particular case, all services were denied. Nothing was granted to the complaining inmate. In particular, the dental case, the issue there was that the doctor wasn't even around because he was out on a separate leave, so there was no services being rendered whatsoever. This is a very different case. The nurse applied her medical training, determined what to be appropriate, and ordered services. So they were given care, what was appropriate. As the district court concluded, at most, and Your Honor, I'm standing out of time, if I could at least conclude that one thought. At most, it's negligence, which is not sufficient to meet the standard in this, Your Honor. Is that true also for the physical therapy, as far as you're concerned? Because that seemed to be something that was very troubling for him. Well, Your Honor, that's what Mr. Parkell believed to be appropriate. The medical records establish that he was sent out for an initial consultation with a third party for physical therapy, and then several months later it was revisited that physical therapy had been completed, page 1019 in the record, and he went in a different direction after that. So it wasn't that there was an intentional denial or intentional delay in those services. It was being addressed. Mr. Parkell, if you look at those pages I've referenced, is what's considered a chronic care patient. That's a box that's checked, which means he sees a doctor on a routine basis. It's not just as he needs. He's a chronic care patient for asthma, so he's seen routinely. All right, thank you very much, Mr. Toms. And we want to have Ms. Bradley a minute on the Eighth Amendment issues. Your Honors, I'd like to start by emphasizing that defendants want to hang their hat here on the fact that Mr. Parkell received treatment, and that should be enough to negate his claims of deliberate indifference. But the fact is that a significant delay in treatment without some sort of medical justification, which defendants have provided none in this case, renders summary judgment improper, because the district court should have evaluated the reason for that delay, and that didn't happen in this case. CMS claims that Mr. Parkell failed to identify the applicable frequency of physical therapy in 2009, but again, at the summary judgment stage, Mr. Parkell was not required to prove deliberate indifference, only that a reasonable juror could have looked at this case and found some evidence of deliberate indifference on the part of defendants. I would point the court again to the Dermer v. O'Carroll case, which is very similar to this. There was a seven-month delay in receiving physical therapy, and when that therapy was delayed for non-medical reasons, summary judgment was improper. Further, the fact that certain inmates were not scheduled for physical therapy as often as others, which is on the record in this case, could still constitute a violation under the Natale case. In this case, evidence of deliberate indifference should survive summary judgment where it looks like the provider was turning a blind eye to an inadequate practice. Here, if the medical defendants want to say that it was DOC policy that he couldn't receive therapy as often as it was prescribed by Dr. Duchettle, by his surgeon, who said it was imperative that he receive this therapy, if he couldn't receive that because of some sort of DOC policy, well, the medical defendants were aware of that, and turning a blind eye to that renders summary judgment improper. Thank you, Ms. Bradley. And Mr. Walsh, on rebuttal. Do you really want to say too much here on this Fourth Amendment question? All I'm saying, Your Honor, is there is no evidence in the record, none, to show that he was, that he had any contact with someone every eight hours. It's just not there. The only thing that the State Defendants relied upon below was that it was justified for security reasons. And the only other thing I want to add. What about the lack of supervision? I mean, Ms. Scott tried to argue that perhaps he could make something out of the, some instruments of crime out of the furniture, the barest of furniture that was in that cell. Even if that was the justification, and I don't know that it is, even if that was the justification, there's no reason why they have to come in every eight hours and do this. So check him when he goes into his cell, and check him when he comes out of his cell. What about, she also mentioned a matter of deterrence, which could be an important point. He knows, I'm getting checked, I can't do anything, so I won't. Your Honor, in my mind, there is no justification for every eight hours. I mean, you're talking about an isolation cell where he can't even have toilet paper. He's not allowed to flush his own toilet. I mean, these are stripped-down cells. He's wearing a T-shirt and boxers. Do you know if there's, is it monitored as well electronically? I don't know, Your Honor. But the suggestion that he's unsupervised in an isolation cell is frankly absurd. And the only other thing I would add is to the extent that the Court has any concerns about whether this case is moved or whether there's sufficient personal involvement, I think it should be remanded so that these issues can be flushed out below. Okay. Thank you. Now I want to thank, we want to thank the firm of Pashman-Stein and Mr. Walsh and Ms. Bradley for your work on this case on a pro bono basis. I want to thank you for your efforts in this regard. Thank you. And we thank, we thank the Delaware Council also. And we'll take the matter under advisement.